# UNITED STATES DISTRICT COURT

for the

Southern District of Indiana

Amber Renee Vanlangen, f/k/a Amber Renee Blevins
*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

**-v-**

Susan Stotts, Rachel DeFord, Barbara Holland, and Christina Eriks
*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names. Do not include addresses here.)*

Case No. 4:26-cv-289-TWP-KMB
*(to be filled in by the Clerk's Office)*

FILED
10/23/2026
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Kristine L. Seufert, Clerk

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(Non-Prisoner Complaint)

**Demand for Jury Trial** [X] **Yes** [ ] **No**

**NOTICE**

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date, the full name of a person known to be a minor, or a complete financial account number. A filing may include *only*: the last four digits of a social security number, the year of an individual's birth, a minor's initials, and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievances, witness statements, evidence, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

## I. Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

**A.** Are you bringing suit against *(check all that apply)*:

☐ Federal officials (a *Bivens* claim)

☒ State or local officials (a § 1983 claim)

**B.** Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

Fourteenth Amendment to the United States Constitution (procedural due process, familial association, and equal protection). See attached Complaint PP 108-148.

**C.** Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

N/A -- Plaintiff does not sue any federal official; this is not a Bivens claim.

**D.** Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

See attached Complaint PP 1-10, 18 (each Defendant was a DCS employee acting in the course and scope of state employment at all relevant times).

## II. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

Name: Amber Renee Vanlangen, f/k/a Amber Renee Blevins

Address: 4085 Lylewood Rd.

Woodlawn (*City*) TN (*State*) 37191 (*Zip Co*)

County: Montgomery County, Tennessee

Telephone Number: 931-801-0154

E-Mail Address: bitterrootsoffaith@gmail.com

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

Name: Susan Stotts

Job or Title *(if known)*: Family Case Manager Supervisor, Indiana Dept. of Child Services

Address: Clark County DCS Office (address for service to be determined; see attached Complaint P 5)

*City* *State* *Zip Code*

County: Clark County, Indiana

Telephone Number: Unknown

E-Mail Address *(if known)*: Unknown

[X] Individual capacity [ ] Official capacity

Defendant No. 2

Name: Rachel DeFord

Job or Title *(if known)*: Family Case Manager, Indiana Dept. of Child Services

Address: Clark County DCS Office (address for service to be determined; see attached Complaint P 6)

*City* *State* *Zip code*

County: Clark County, Indiana

Telephone Number: Unknown

E-Mail Address *(if known)*: Unknown

[X] Individual capacity [ ] Official capacity

Defendant No. 3

Name: Barbara Holland

Job or Title *(if known)*: Family Case Manager, Indiana Dept. of Child Services

Address: Clark County DCS Office (address for service to be determined; see attached Complaint P 7)

*City* *State* *Zip Code*

County: Clark County, Indiana

Telephone Number: Unknown

E-Mail Address *(if known)*: Unknown

[X] Individual capacity [ ] Official capacity

## III. Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

**A.** Where did the events giving rise to your claim(s) occur?

Clark County, Indiana (DCS offices and placements); see attached Complaint ¶ 12.

**B.** What date and approximate time did the events giving rise to your claim(s) occur?

October 23, 2024 through June 12, 2025 (case closed); see attached Complaint ¶¶ 13, 107.

**C.** What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

See attached Complaint ¶¶ 15-107, incorporated by reference herein.

## IV. Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

## V. Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: ____________________

Signature of Plaintiff /s/ Amber Renee Vanlangen

Printed Name of Plaintiff ____________________

## ADDITIONAL PAGE -- ATTACHED PURSUANT TO SECTION II.B INSTRUCTIONS

("Provide the information below for each defendant named in the complaint ... Attach additional pages if needed.")

Caption: Amber Renee Vanlangen, f/k/a Amber Renee Blevins v. Susan Stotts, Rachel DeFord, Barbara Holland, and Christina Eriks, in their individual capacities

### Defendant No. 4

| | |
|---|---|
| Name | Christina Eriks |
| Job or Title (if known) | Older Youth Case Manager, Indiana Dept. of Child Services, Region 3 |
| Address | DCS Region 3 Office, South Bend, Indiana (address for service to be determined; see attached Complaint P 9) |
| County | St. Joseph County, Indiana |
| Telephone Number | Unknown |
| E-Mail Address (if known) | Unknown |

[X] Individual capacity [ ] Official capacity

# ATTACHMENT

Complaint for Violation of Civil Rights (42 U.S.C. Section 1983) -- full narrative statement attached hereto and incorporated by reference, as referenced throughout the preceding clerk-supplied form pursuant to S.D. Ind. Local Rule 8-1 and the form's own "see attached" instructions.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| AMBER RENEE VANLANGEN, f/k/a AMBER RENEE BLEVINS,<br><br>Plaintiff,<br><br>v.<br><br>SUSAN STOTTS; RACHEL DEFORD; BARBARA HOLLAND; and CHRISTINA ERIKS, each in his or her individual capacity,<br><br>Defendants. | Case No. ______________ |

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**

**JURY TRIAL DEMANDED**

## I. NATURE OF THE ACTION

1. This is a civil-rights action by a mother against four employees of the Indiana Department of Child Services ("DCS"). Plaintiff's son was in DCS's care after October 2024 under a 2013 Tennessee custody order that had given his father, not Plaintiff, legal custody. Plaintiff alleges that DCS employees (1) gave her less than a day's informal notice of the October 25, 2024 detention hearing, at which she had not been served; (2) substantiated child neglect against her in November 2024 for "not picking up" a son she had no legal custody of, without telling her or giving her a chance to contest it; (3) in December 2024 asked only the father, never her, about a home for her son; and (4) on May 14, 2025 instructed that her son's telephone calls be supervised, after which, as she further alleges, her calls with him were interrupted, monitored and limited. She also alleges that, in the November 2024 finding, DCS treated her differently from the father for the same act, without a rational basis. The act was not taking D.B. back after

his release from detention. The father held full custody and had been charged with assaulting D.B., yet the 311's conclusion found insufficient evidence of neglect by him because he was complying with a court order, while Plaintiff, who had no custody, was found to have neglected D.B. As background, she also describes a January 2025 DCS decision that contact with her son be supervised and DCS's April 2025 handling of her son's hospitalization and move; she asserts no separate claim based on them.

2. Plaintiff does not ask this Court to review, reverse or declare invalid any order or ruling of the Clark Circuit Court or the Indiana Court of Appeals. She seeks damages for the Defendants' own conduct as DCS employees.

3. DCS itself told the Indiana Court of Appeals that complaints about D.B.'s treatment in DCS placements "are separate causes of action outside the scope of the CHINS proceeding" (Br. of Appellee 40).

## II. PARTIES

4. Plaintiff Amber Renee Vanlangen, formerly known as Amber Renee Blevins, lives in Clarksville, Tennessee. She is the mother of D.B., who was born in 2008 and is now an adult. D.B. is not a party and no claim is made on his behalf. Because D.B. was a minor during the events described, Plaintiff refers to him by initials.

5. Defendant Susan Stotts was at the relevant times a Family Case Manager Supervisor employed by DCS in Clark County, Indiana. She approved the assessment described below.

6. Defendant Rachel DeFord was at the relevant times a Family Case Manager employed by DCS in Clark County, Indiana. She was the assessment case manager for the events described below. DCS's Form 311 identifies the assessing worker on its first page as "Rachel N.

Blevins" and states on its second page that the assessment "was assigned to Family Case Manager (FCM) Rachel DeFord." DCS's contact log likewise lists "Rachel N. Blevins" as the assessment worker while narrating the same entries as "FCM DeFord." Plaintiff alleges on information and belief that these refer to one person, Defendant DeFord.

7. Defendant Barbara Holland was at the relevant times a Family Case Manager employed by DCS in Clark County, Indiana. She was D.B.'s permanency case manager after October 2024.

8. Tiffany Huffman, a Family Case Manager Supervisor, and Dawn Deckard, a Family Case Manager, are DCS employees in Clark County, Indiana who appear in DCS's records described below. Huffman staffed decisions about D.B.'s case with Holland and supervised Deckard; Deckard was assigned to D.B.'s case from about January 2025. Neither is a defendant.

9. Defendant Christina Eriks was at the relevant times an Older Youth Case Manager employed by DCS in Region 3, based in South Bend, Indiana. She was assigned to D.B.'s case in or about May 2025.

10. Each Defendant acted under color of state law. Each is sued in his or her individual capacity only.

## III. JURISDICTION, VENUE AND TIMELINESS

11. This Court has jurisdiction over these claims under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4), because they arise under the Fourteenth Amendment and 42 U.S.C. § 1983.

12. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2). The events occurred in Clark County, Indiana, which lies in the New Albany Division of this District, and Defendants reside or work in Indiana.

13. The earliest conduct of any Defendant on which a claim is based occurred on October 23, 2024; the latest occurred in May 2025. Earlier events are pleaded as background. The two-year limitations period of Ind. Code § 34-11-2-4 applies to these claims, and Plaintiff files within two years of the earliest such conduct.

14. The Defendants are joined under Federal Rule of Civil Procedure 20(a)(2) because the claims arise out of the same series of occurrences, DCS's handling of the same child-in-need-of-services case, and present common questions of law and fact.

## IV. FACTS

15. DCS's contact log has reached Plaintiff in two versions, and this complaint says which one it cites. The first was generated March 20, 2025, is 10 pages long and covers October 23, 2024 through March 11, 2025 (the "March Log"). Plaintiff believes it is the file "Contact Log Redacted.pdf" that DCS's attorney, Daniel Lane, attached to his March 21, 2025 email to her, based on the matching file name and generation date. In that email he wrote that DCS had searched its records and attached the documents it had in its possession, and the attachments were a contact log, case notes and medical records. The second version was generated August 8, 2025, is 27 pages long and covers October 23, 2024 through June 5, 2025 (the "August Log"). It was among the records DCS's attorney emailed to Plaintiff in two compressed files on September 11, 2025.

16. Plaintiff had asked DCS's attorney in writing on August 7, 2025 for, among other things, case notes, contact logs and "[a]ll exhibits, attachments, and referenced documents" in DCS's reports. On August 8, 2025 he replied that he agreed she was "entitled to the records you're requesting" and would "compile those records and send them to you via email." The records arrived on September 11, 2025. Where the two Logs overlap, the entries on which

Plaintiff relies in this complaint are identical in date, time, participants and wording. "Both Logs" in a citation means both versions, at the page stated.

**A. Plaintiff, D.B. and the custody order**

17. Plaintiff is D.B.'s mother. Her parental rights have never been terminated.

18. A 2013 order of the Juvenile Court of Montgomery County, Tennessee placed D.B. in the full care, custody and control of his father, Brandon Blevins, and gave Plaintiff visitation at the father's discretion. The order refers to the father as "Scott Blevins"; his full name is Brandon Scott Blevins. D.B. lived with his father in North Carolina.

19. The order provided that D.B. would remain in his father's custody until Plaintiff completed the plan the order required, showed a material change in circumstances, and a change of custody was in D.B.'s best interest. It contains no no-contact term.

20. In August 2024 Brandon Blevins assaulted D.B. in Stanly County, North Carolina. North Carolina charged him with a felony, assault inflicting serious bodily injury, in State v. Brandon Scott Blevins, No. 24CR392107-830. The warrant, issued August 24, 2024, describes injuries to D.B.'s face, knees, elbows, back and eye. The release conditions order the father not to have contact with D.B.

21. After the assault, D.B.'s father sent him to live with his uncle in Indiana under a power of attorney the father signed in August 2024.

**B. Plaintiff's circumstances in October 2024**

22. In October 2024 Plaintiff, her partner and their young children were camping in a camper at a remote, wooded location in Tennessee while her partner worked on a contract job there. During the day Plaintiff was the only caregiver for the young children.

23. On October 10, 2024 Plaintiff paid for campsites at Natchez Trace State Park for October 11 through 20, 2024. The park's confirmation warns that there is very limited, if any, cell service in the Pin Oak campground area.

**C. October 23-25, 2024: what Plaintiff told DCS and what DCS wrote down**

24. In October 2024 D.B., then sixteen, was held at the Clark County juvenile detention center from about October 21 to October 23, 2024. The delinquency petition filed October 22, 2024 (No. 10C04-2410-JD-000210) identified only D.B.'s father as his parent and custodian and listed the father's North Carolina address as D.B.'s residence. It did not name Plaintiff. The detention center did not contact Plaintiff about picking D.B. up. Nor did Clark County Probation contact Plaintiff before D.B. was taken into DCS's emergency custody later that day; Plaintiff was not asked whether she would take custody of D.B. at any point before DCS assumed custody. Plaintiff possesses audio recordings reflecting that detention-center staff and a Clark County Probation officer communicated with D.B.'s father about D.B.'s arrest, release and the initial juvenile delinquency proceedings during this period, and that neither contacted Plaintiff.

25. On October 23, 2024 DCS obtained an emergency custody order for D.B. and placed him at the Clark County Youth Shelter. DeFord was the assessment case manager.

26. At 12:50 p.m. on October 23, 2024 DeFord met D.B. at the detention center. Her contact-log entry records that D.B. "reported he was sent to Indiana to live with his uncle after he and his father got into an altercation. He stated his dad beat him up pretty badly and he was in Stanly Hospital for a week before going to his uncle's." (Both Logs, p. 1.)

27. At 3:10 p.m. DeFord spoke with a North Carolina DCS worker. DeFord's entry records that D.B.'s father assaulted him in August, that the father "still has pending charges," and that a no-contact order was entered through the Stanly County courts. (Both Logs, p. 1.)

28. DeFord therefore knew on October 23, 2024 that D.B.'s father had physically assaulted him, faced pending criminal charges, and was subject to a no-contact order.

29. DeFord telephoned Plaintiff that afternoon. DCS's contact log records the call. Its entry records, among other things, that "Brandon has physical legal custody. Mom has visitation." (Both Logs, pp. 1-2.)

30. DeFord's log entry for the call does not record any statement by Plaintiff that she refused to take D.B. It does not record that DeFord asked whether Plaintiff wanted D.B. placed with her.

31. DeFord's Form 311, completed three weeks later, states that on this call "Amber stated she was not willing to have [D.B.] back in her care and was not coming to get him." DeFord's contact-log entry for the same call, made the day it occurred, records no such statement (¶ 30).

32. During that call Plaintiff told DeFord that she was at a remote campsite and had to move campsites; that she was the only caregiver for her small children; and that D.B. had been aggressive toward her family.

33. At 11:16 a.m. on October 24, 2024 DeFord texted Plaintiff that "[w]e will have court tomorrow at 9am EST that you can attend virtually" and that "[s]ince nobody is willing to take [D.B.] back home he was detained and placed in our care." DeFord asked for Plaintiff's date of birth "for our documents" and said she would send Zoom information.

34. At 11:21 a.m. Plaintiff replied with her mailing address and wrote that she would be "packing up, hitching up, and checking out of my campsite on time to move to another site and will not be available for this zoom, nor do I have enough signal to even hold a video call where I am." At 11:25 a.m. DeFord answered, "Okay I will let the courts know."

35. Plaintiff offered to send a letter. DeFord wrote at 11:31 a.m. that she was "not sure if it would be presented or not" and that the judge "will only hear on the detention to determine if we had legal sufficiency to take wardship."

36. That day DeFord emailed DCS: "Mother has reported she is not going to be present." The email does not say why.

37. The contact log DCS produced has no entry for October 24, 2024, and none for DeFord's texts to Plaintiff or Plaintiff's email to DeFord that day. Its entries run from DeFord's October 23 call with Plaintiff to the October 25 hearing, where it records "Detention and Initial for dad only held." (Both Logs, pp. 1-2.)

38. At 12:23 p.m. on October 24, 2024 Plaintiff emailed DeFord at her DCS address. She wrote that she "would love nothing more than to have [D.B.] in my custody"; that she had agreed to take him for the summer; that he became aggressive toward her and her younger children; that she and D.B.'s father "were making plans to send him to job corp where he could pursue a career in welding and the us forest service"; that she would "never feel safe alone with my son again"; and that she had told his father he had to go back "because I could not physically handle him."

39. Also on October 24, 2024 Kelly Hargett, a DCS Education Consultant who is not a defendant, emailed school personnel that D.B. "will need an Educational Surrogate appointed

for him as legal guardian is not willing to participate, Dad is in North Carolina and has a no contact order and mom is in Tennessee and is refusing to come get him."

40. On October 27, 2024 Plaintiff texted DeFord: "I honestly do not care if Indiana terminated my rights to [D.B.] as I physically couldn't handle him and he has threatened to kill me. However, last resort I would have left my husband and children to pick up [D.B.] …"

41. On October 25, 2024 DCS filed a Preliminary Inquiry in the Clark Circuit Court. It states that Plaintiff "absolutely could not have [D.B.] with her as a result of these behaviors." Its incident report names only D.B.'s father as the person against whom the allegations were made. It does not name Plaintiff.

42. The same day DCS filed a Verified Petition in the Clark Circuit Court, which states that Plaintiff "indicated that she, too, was unwilling to take custody of her child, as she feared for her safety."

43. At 8:56 a.m. on October 25, 2024 DeFord texted Plaintiff the Zoom information. DeFord's text read: "I know you said you wouldn't be attending today, but in the event your mind has changed and to cover myself, the Zoom information is as follows…" Plaintiff replied "Thank you" at 8:57 a.m. Plaintiff did not attend. She had told DeFord the day before that she did not have enough signal to hold a video call and would be moving camp (¶ 34), and she was the only caregiver for her young children.

44. The hearing began at 9:00 a.m. on October 25, 2024. The Court noted, "I do not see Amber Blevins. She is not present."

45. No summons or copy of the Verified Petition had been served on Plaintiff before the hearing. At a hearing on April 3, 2025 DCS's attorney said of the October 25 emergency

detention hearing, "We were not able to serve her for that," and the Court said, "She hadn't been served."

46. At 7:17 p.m. on October 25, 2024, after the hearing, DeFord texted Plaintiff that DCS's attorney asked whether she would like to receive service by email. Plaintiff said yes.

47. Plaintiff knew on October 24 that a hearing would be held the next morning. DeFord told her about it less than twenty-two hours beforehand. Before the hearing Plaintiff was not served with a summons or a copy of the Verified Petition (¶ 45).

48. Indiana Code § 31-34-4-6 directs DCS to give a parent of a child alleged to be abused or neglected written information about specified rights, including the right to a court hearing within forty-eight hours after removal at which the parent may ask for the child's return. The notice is due at the earlier of the time the child is taken into custody or the time DCS files the petition. Plaintiff cites the statute to show the notice Indiana itself provides for, not to enforce it.

49. DCS took custody of D.B. on October 23, 2024 and filed its Verified Petition on October 25, 2024. The Court's docket shows a Summons and Notice of Rights addressed to Plaintiff filed that day, but none was served on her before the hearing (¶ 45). The Court's docket records that rights were read aloud to the father at the hearing; Plaintiff was not present. Plaintiff received no written statement of those rights before the hearing. The only Summons and Notice of Rights in the records available to her is dated November 1, 2024 and set a continued initial hearing for December 5, 2024.

**D. The November 2024 neglect finding**

50. DCS completed a Form 311 assessment of the allegation of neglect. It lists Plaintiff as a "Perpetrator" and substantiates neglect against her. Its narrative states that Plaintiff

"absolutely was not picking up" D.B. and "does not want him in her care as she feels threatened by him and he has been aggressive in the past."

51. The 311's decision table lists both Plaintiff and D.B.'s father as "Perpetrator" with neglect "Substantiated." Its conclusion, however, finds "a lack of a preponderance of evidence" of neglect by the father, because his refusal to pick D.B. up "was due to a legal court order" and he "was remaining in compliance with these orders."

52. The 311 records an October 25, 2024 date of interview for the father. It records no date of interview for Plaintiff.

53. The 311 states that DeFord, Holland and Stotts "had a virtual staffing with the DCS Clinical Specialist" during the assessment.

54. The 311's notice section states: "Notice of Availability mailed to Brandon Blevins. Notice of Availability mailed to Amber Blevins." It does not state the date, address or method of mailing.

55. Plaintiff did not receive a Notice of Availability or any other notice of the 311 finding from DCS.

56. The 311 itself records that the father told DeFord he "was not coming to get [D.B.] nor did he want [D.B.] back in his home," and that he "would rather do any current jail time from the pending charges than to have [D.B.] back in the home."

57. The 311 does not state that D.B.'s father held full legal custody under the 2013 order or that Plaintiff did not, though DeFord's own contact log recorded that "Brandon has physical legal custody. Mom has visitation" (¶ 29). It refers to the father only as having been the "primary caregiver." It does not mention Plaintiff's October 24, 2024 written statement that she "would love nothing more than to have [D.B.] in my custody" (¶ 38).

58. DeFord's own contact log recorded D.B.'s report that his father "beat him up pretty badly" and recorded the pending charges and the no-contact order (¶¶ 26, 27). The 311 describes the August 2024 events as an "altercation" that "resulted an a [sic] No Contact Order." It treated the father's refusal to take D.B. as compliance with a court order and Plaintiff's refusal as neglect, without noting that Plaintiff, too, did not have custody. The same Form 311 identifies D.B.'s living arrangement as "Non-parent relative caregiver" and identifies his uncle, Christopher Ray Klingenstein, as the "Other Person Responsible for Child(ren)." On October 23, 2024, DeFord learned from North Carolina DSS worker Brenda Perez that North Carolina "[g]ave uncle POA and sent him to Indiana" (¶ 27). The power of attorney executed by D.B.'s father on August 26, 2024, appointed Christopher "to act as the guardian of my minor child … entirely in loco parentis" (¶ 21). The Form 311 further records that DeFord "spoke to Chris and his wife, Laura," who declined continued placement; that North Carolina "did have a report about the altercation"; that DeFord "found a Professional Service Request made by North Carolina to check the Uncle's home before [D.B.] was sent there"; and that "North Carolina closed their investigation as soon as [D.B.] was placed in Indiana." By letter dated September 18, 2024, Montgomery County, North Carolina Department of Social Services notified Plaintiff that it had substantiated "Physical abuse against Dylan" and closed its investigation because the identified risk of harm had been "addressed and eliminated." The Form 311 does not identify that substantiation finding and describes the underlying incident as an "altercation." Although the Form 311 does not identify Christopher as a perpetrator, it lists Plaintiff's relationship to D.B. as "Caregiver, Parent."

59. When DCS substantiated neglect against Plaintiff, she did not have custody of D.B. A court order gave his father full custody and her visitation at his discretion, and DCS's own log said so.

60. In its Brief of Appellee in the Indiana Court of Appeals, served September 19, 2025, DCS stated that "Mother and Father each explained they were unwilling and unable to legally take custody of Child" (Br. 10) and described Plaintiff as "as unable, legally, to have placement of Child as Father" (Br. 39).

61. Stotts approved the 311 on November 14, 2024. She was the assessment supervisor, took part in the staffing described in ¶ 53, and attended the November 14, 2024 Child and Family Team Meeting. The inconsistent treatment of the two parents described in ¶¶ 51 and 58 appears on the face of the document she approved.

62. DeFord held Plaintiff's October 24, 2024 written statement when she completed the 311, and her own contact log recorded that the father had custody. The 311 mentions neither.

63. On November 14, 2024 DCS held a Child and Family Team Meeting facilitated by DeFord and attended by Stotts. The notes list Plaintiff and the father as parents and record "No identified/willing caregiver" and no back-up plan. They also record that no safety concerns were reported by the team, that the permanency plan was reunification, and that Plaintiff would "begin supervised telephonic therapeutic visits" with D.B. The notes do not record that Plaintiff requested or agreed to supervision; they record it as the plan DCS adopted.

64. Plaintiff received no hearing before DCS made the finding, and DCS gave her no opportunity to present information or contest the finding before it was made.

65. Plaintiff did not receive the Predispositional Report ("PDR") before February 18, 2025, when her then court-appointed attorney posted it to her case portal. The PDR repeats the

311's conclusion. It is a court report, not a Notice of Availability, and Plaintiff objected to it in writing.

**E. What a substantiated finding does under Indiana law**

66. Indiana Code chapter 31-33-26 provides for a Child Protection Index. Section 31-33-26-3 requires the Index to include, among other things, an automated risk assessment that lets case managers and supervisors review a substantiated case's prior history, and § 31-33-26-16 lists who may obtain Index information, including law enforcement agencies, persons and agencies entitled to receive reports under chapter 31-33-18, DCS licensing staff, and juvenile courts and parties in certain placement cases that require a criminal history check. DCS's own Child Protection Index policy states that when a report is substantiated, DCS "will enter all appropriate information into the Child Protection Index," and describes the Index as allowing, among others, "outside agencies conducting CPS checks on their employees or volunteers" to see substantiated information. DCS's Form 311 itself states that a "Notice of Availability" of the right to contest the finding was mailed to Plaintiff (¶ 54), a notice that Indiana law requires only after a substantiated finding is entered in the Index. On information and belief, based on that policy and that Notice of Availability, DCS entered the finding against Plaintiff in the Index, where it remains available to the agencies and persons listed in § 31-33-26-16. Plaintiff does not allege, and has no present evidentiary basis to allege, that any specific employer, licensing body, or other third party has actually queried or relied on that entry; that remains a matter for discovery.

67. Indiana Code § 31-34-4-2 provides that DCS may not make an out-of-home placement if a person residing in the proposed location has a "substantiated report of child abuse or neglect," subject to an exception the statute allows the court or DCS to apply after considering

specified factors. The bar is stated in terms of a substantiated report, not an Index entry. Plaintiff pleads this as background, to show the consequence Indiana's own statute attaches to a substantiated finding, not to enforce it.

**F. December 2024: the placement search**

68. On December 11, 2024 Holland recorded that she asked D.B.'s father whether he consented to a foster home, took names of his relatives, and found that no relatives contacted were willing or able to take D.B. Her only recorded effort to reach Plaintiff that morning was one call that went unanswered. (Both Logs, pp. 3-4.)

69. Placement planning had begun earlier. On December 5, 2024 Holland recorded that D.B. was going to visit "Tatum, possible future placement" (Both Logs, p. 3). On November 27, 2024 a DCS permanency staffing that Holland attended recorded that "[D.B.]'s mother is minimally involved and does not want him back in her home either." DCS's records show no occasion between October 23 and December 11, 2024 on which any Defendant asked Plaintiff about placement.

70. DCS had Plaintiff's October 24, 2024 written statement that she "would love nothing more than to have [D.B.] in my custody," in which she also explained why she could not safely care for him alone (¶ 38), her telephone number and her email address. DCS's contact log records no occasion on which any Defendant asked Plaintiff whether she wanted D.B. placed with her.

71. Plaintiff attended the November 14, 2024 Child and Family Team Meeting by Teams. DCS's notes of that meeting record no Defendant asking her whether she wanted D.B. placed with her. The same notes record that Plaintiff's partner stated he was not willing to have D.B. in their home. That statement describes the partner's own position; the notes do not record

Plaintiff declining placement, offering an alternative, or being asked by any Defendant whether she wanted D.B. placed with her despite her partner's statement.

72. The notes of that meeting, which record that no willing caregiver was identified, and the 311's description of Plaintiff were in DCS's case record when Holland searched for placements.

73. Indiana Code § 31-34-4-2(a) provides that, when a court orders out-of-home placement of a child taken into custody, DCS is responsible for the placement and, before considering any other out-of-home placement, must consider a suitable and willing relative or de facto custodian. Plaintiff is D.B.'s mother.

**G. January to April 2025: the January 6 entry and what DCS and the Court said about contact**

74. On January 6, 2025 Holland recorded in DCS's contact log that D.B.'s placement caregiver had reported arguments between D.B. and Plaintiff by text message; that the caregiver had told D.B. not to talk to his mother "right now"; and that "if they were supposed to have visitation it needs to be supervised due to the arguing." Holland wrote: "FCM agrees with Tatum and after staffing with Supervisor Huffman, it was agreed that any contact between [D.B.], His mother, his step mother and his girlfriends mother needed to be supervised." (Both Logs, p. 4.)

75. The entry records that it was "unknown why" Plaintiff did not want D.B. speaking with certain people. It records no call to Plaintiff about the arguments and no opportunity for her to respond before the decision. (Both Logs, p. 4.)

76. The entry cites no court order authorizing the restriction. It records no finding that Plaintiff had harmed D.B. or posed a risk to him. At the November 14, 2024 Child and Family Team Meeting DCS had recorded no safety concerns and a plan for Plaintiff to have telephone contact with D.B. (¶ 63).

77. The January 6, 2025 entry ends with this sentence: "Below are messages between [D.B.] and his mother Amber, a screenshot from Tatum regarding the concerns with them arguing and messages from Chane (the potential kinship placement)." Plaintiff has found no message or screenshot following that sentence in the March Log or the August Log, or in the other records DCS produced on March 21 and September 11, 2025 that she has reviewed. She does not know whether those materials exist in DCS's case-management system, why they do not appear in the produced files, or whether the cause is the way the log was exported. She does not allege that the entry was altered, that any message was fabricated, or that anyone withheld the materials on purpose. She identifies them as within DCS's possession and as likely to bear on what the entry describes after discovery (Fed. R. Civ. P. 11(b)(3)).

78. DCS did not tell Plaintiff of the January 6, 2025 decision. Plaintiff does not allege that it caused her to lose contact with D.B. between January and March 2025, and she does not know whether it was applied, relayed to others, or later withdrawn. She pleads the entry as background and asserts no separate count based on it.

79. On January 10, 2025 Huffman wrote in the contact log that D.B. "was removed from his father in North Carolina due to physical abuse," and that Plaintiff "refused to pick him up when he was released from the Juvenile Detention Center." The entry does not say who asked Plaintiff to pick D.B. up, when, or how, and records no call to Plaintiff. (Both Logs, p. 5.)

80. On February 11, 2025 Huffman moved D.B. to an emergency shelter in Indianapolis. DCS's log for that date records that most of his belongings, "including his phone," would be "kept locked up"; that "electronics are not allowed at any time in the shelter"; and that D.B. "is able to maintain relationships with family and kin through phone calls, as he added several people to his phone list at the shelter." (Both Logs, p. 8.) Plaintiff does not allege that

those shelter rules were a decision by any defendant about her contact. She pleads them to distinguish the shelter's phone rules from the January 6, 2025 decision, which was made about contact between D.B. and his mother in the home of the caregiver who had reported the arguments.

81. At a hearing on April 3, 2025 D.B. asked whether he could have further contact with his mother. The Court answered, "I have not restricted contact with Mom," and then, "I've not restricted any contact with your mom, okay? So you can talk to your mom when you want to." (Tr. 112:14-23.) DCS's attorney responded that Plaintiff was ordered to participate in visitation.

82. At 3:05 p.m. Central time on April 17, 2025, after Plaintiff had written that morning asking for assurance that D.B.'s ability to communicate with family was not being restricted, DCS's attorney, Daniel Lane, copying Deckard, wrote to her: "DCS has not placed any restrictions on [D.B.]'s ability to communicate with you or any other family member." The statement does not mention the January 6, 2025 directive (¶ 74). Plaintiff has seen no DCS record withdrawing that directive before April 17, 2025, and does not know whether it had been withdrawn, was not being applied, or was overlooked. A DCS entry of May 14, 2025 (¶ 95) records an instruction from another DCS employee that D.B.'s telephone calls be supervised.

**H. April 2025: the hospitalization and the move**

83. DCS's own log records Deckard dialing numbers that were not Plaintiff's on January 31, 2025, when the entry records that the phone "has been disconnected," and on February 4, 2025, when the entry records that the person who answered said it was not Plaintiff's number (Both Logs, pp. 6-7). Plaintiff's number, which appears in every email she sent DCS, is the number in the signature block of this complaint.

84. On April 14, 2025 Deckard recorded in the contact log that she "was informed that [D.B.] was taken to the hospital over the weekend due to a physical altercation with 2 other clients at Firefly," the Indianapolis shelter where DCS had placed him. The same entry records that Deckard and her supervisor, Huffman, "spent time telling [D.B.] that Firefly was his only option for now and he would have to go back," and that Deckard returned him to Firefly. It records no notice to Plaintiff. (August Log, p. 12.)

85. Plaintiff learned of the hospitalization on April 14, 2025 from another source. The hospital refused to give her information. She wrote to DCS's attorney and the guardian ad litem that day asking for D.B.'s condition and why she had not been told.

86. DCS moved D.B. to a new placement on April 16, 2025. The first message in the record telling Plaintiff the placement was Prairie View is a DCS attorney's email at 3:05 p.m. Central time on April 17, 2025, after the move. On April 15, 2025 Deckard had emailed Plaintiff that DCS had "located a new placement" without saying where it was or when D.B. would move.

87. Deckard and Huffman had Plaintiff's correct email address and telephone number and had been corresponding with her. DCS's local office director later wrote, on May 20, 2025, that "communication in your preferred method could have been improved."

88. Plaintiff pleads the facts in ¶¶ 84-87 as background and asserts no separate count based on them.

**I. April to May 2025: Plaintiff's telephone calls with D.B. at Prairie View**

89. Prairie View Therapeutic Group Home, where D.B. lived from April 16, 2025, is not a defendant, and Plaintiff does not allege that its staff are state actors. The paragraphs below set out what Plaintiff herself experienced and what DCS's own records show about DCS's

directions to Prairie View. Plaintiff does not allege that Holland personally interrupted, monitored or limited any call at Prairie View.

90. Plaintiff did not hear from D.B. between about 2 p.m. on April 16, 2025 and a telephone call she herself placed to him on April 17, 2025. On April 18, 2025 she wrote to DCS's attorney and D.B.'s guardian ad litem that D.B. had told her that Prairie View's probationary period and leveled behavioral system prevented him from using his personal email account, which she used to send him case documents. On April 25, 2025 she wrote again, to DCS's attorney, Deckard and the guardian ad litem, that he still lacked access. Plaintiff has found no DCS reply addressing email access. D.B.'s own rights are his, not hers, and Plaintiff asserts none of them; she pleads these facts only because email was one of the ways she communicated with her son.

91. On April 25, 2025 Plaintiff telephoned D.B. at Prairie View at about 6:00 p.m. Eastern time. Her telephone records show calls of 16 minutes 2 seconds and 16 minutes 26 seconds, with redials between them. Plaintiff alleges from her own participation in the calls that the first call was cut off while she was speaking with D.B.; and that during the second, while she was reading D.B. her court filing, Prairie View staff rushed her off the telephone, so that she had to ask for thirty more seconds. She alleges that on April 24, 2025 D.B. told her that staff had resisted letting him call her and that the shelter had withheld his list of telephone numbers. She described these events in a motion filed on April 28, 2025 in the state court and served on DCS's attorney and another DCS family case manager.

92. Plaintiff alleges, from her participation in the calls and what D.B. told her, that from about May 8, 2025 Prairie View staff limited her calls with D.B. to ten minutes; that a staff member "got ugly" with D.B. for going two minutes over; that her calls on May 11 and May 18,

2025 were ended under that limit; and that on May 22, 2025 a male staff member ended a call under the ten-minute rule while female staff said they were "not on board" with D.B. speaking with her. The April 25 calls described above each ran about sixteen minutes; on Plaintiff's account the ten-minute limit began in May.

93. Plaintiff alleges from her own experience that during this period staff interrupted and monitored her conversations with D.B., particularly when she discussed his court case, and that the limits on the calls increased between April 17 and May 22, 2025.

94. Plaintiff told DCS. On May 12, 2025 she emailed Christina Eriks, copying Deckard and others, reporting a May 11, 2025 assault on D.B. at Prairie View; the email says that DCS had "not responded to my previous communications regarding [D.B.]'s safety, communication restrictions, and other case issues" but does not otherwise describe the restrictions. She complained to the DCS Ombudsman on May 12 and 13, 2025. A motion she filed on May 19, 2025 describing the ten-minute limits was served on Deckard. On May 20, 2025 DCS's local office director replied as described in ¶ 87. Plaintiff has found no DCS record of any step to lift a restriction on her calls.

95. On May 14, 2025 at 12:11 p.m., Christina Eriks, a DCS older-youth case manager, spoke by telephone with a Prairie View staff member, Tonice Fenton. DCS's entry records that Fenton said staff "has been giving him no limits on the number of phone calls or the length of phone calls, which is causing issues in the home," that she had told staff "phone calls are limited and should be followed," and that Eriks "reported that his phone calls should be supervised at this time." (August Log, p. 14.) Fenton "reported that she understood and would advise staff." This was a separate act from the January 6, 2025 directive and occurred 41 days after the Court said it had not restricted contact (¶ 81). The entry concerns D.B.'s telephone calls

generally. It cites no court order and records no notice to Plaintiff. Plaintiff pleads Eriks's conduct separately in Count V.

96. The May 14, 2025 entry is also evidence against Plaintiff's account of ten-minute limits, because Fenton described staff as having given D.B. no limits. Plaintiff does not know what limits Prairie View applied before May 14, 2025, or why Fenton's description differs from her own. Plaintiff's account rests on her participation in the calls.

97. DCS and D.B. have also described the contact as continuing. On May 1, 2025 DCS's attorney told the Court that Plaintiff was "engaged in regular phone contact" with D.B. (Tr. 141:6-9), and D.B. told the Court that "ever since the last communication effort with her where y'all approved me to talk to her. Ever since then our relationship has gotten a lot better" (Tr. 137:9-11). Plaintiff does not allege that all contact was prevented. She alleges that the contact she had was interrupted, monitored and limited as described above.

98. DCS's log for May 23 to 26, 2025 (August Log, pp. 17-19) records that D.B. declined calls from Plaintiff and said he "can no longer, for right now, deal with her." Plaintiff does not allege that Eriks or any other defendant caused those refusals, and the log does not say why D.B. declined. She alleges the following about that period. On May 22, 2025, the day before the first recorded refusal, she emailed Eriks and Eriks's supervisor, Heidi Miller, that D.B. had told her Prairie View staff had falsely claimed she cursed at them and were manipulating him to limit contact with her, and she asked that staff be prohibited from retaliating against him; Eriks replied on May 23, 2025, "Received and reviewed." On May 25, 2025 D.B. emailed Plaintiff: "Yeah, I'm good. I have my phone Ive been busy with graduation." Plaintiff alleges that D.B. has told her that he had been threatened for communicating with her and that he believed the best way to deal with the officials involved was to act as though he did not want to communicate. The

records Plaintiff has do not establish whether the recorded refusals reflected D.B.'s own wishes, the pressure he described, or both. Plaintiff identifies the cause of the May 23 to 26 refusals as a matter likely to have evidentiary support after discovery of Prairie View's and DCS's call records and staff communications (Fed. R. Civ. P. 11(b)(3)).

99. Eriks's May 14, 2025 entry does not mention Plaintiff or her May 12 email, and Plaintiff does not know whether Eriks knew before May 14 that Plaintiff objected to the limits on her calls. Plaintiff does not know how Fenton's report to Eriks came about or what Eriks knew of Prairie View's existing call rules. The entry records that Eriks, not Fenton, gave the instruction.

100. On May 19, 2025, at 9:22 a.m. by the time shown on Eriks's copy, Plaintiff emailed Eriks, DCS's attorney, Deckard, Tolnay, the local office director and the DCS Ombudsman, copying D.B.'s attorney. She wrote that Prairie View staff had intensified restrictions on D.B.'s calls with her; that "Staff claims Eriks relayed Deckard's directive to restrict and monitor our communications"; and that after a May 18, 2025 assault on D.B. by other residents staff had not provided medical care, reported it to police or allowed him to call 911, and had threatened punishment. She demanded that DCS "Cease all communication restrictions." Plaintiff does not know whether the statement she attributed to staff is true. At 1:11 p.m. EDT (12:11 p.m. Central) the same day Eriks replied: "Each facility has their own policy regarding phone calls. I just spoke with Prairie View this morning regarding their policy." She listed "1 phone call daily," "after 6pm but before 8pm," and "All calls are supervised and should be positive in nature. Staff will re-direct negative conversations or topics that should not be discussed and if there are multiple redirections during a phone call, staff will end the phone call." Eriks did not write that she had approved or directed those rules, and her reply did not address the assault, the 911 report or the staff-conduct report. Plaintiff replied later that day, describing

Eriks's email as justifying Prairie View's restrictions, stating that the only "negative" communication she could identify was telling D.B. of the May 1, 2025 reunification plan, and again demanding that the restrictions cease. DCS's case notes contain the emails, which Eriks forwarded to the case file. Plaintiff has found no DCS record that Eriks lifted or changed the supervision instruction in response.

101. DCS's log shows Eriks continued to direct how Prairie View handled Plaintiff's calls. On May 23, 2025 Eriks told Fenton (August Log, p. 18) that staff should document every call D.B. has, its time, length and participants, that if D.B. declined a call with his mother the log should say so and D.B. should initial it, and that staff should keep their words "limited and straight to the point" when speaking with him about it, with several staff present "in clear view of security cameras." Plaintiff pleads these entries as evidence of Eriks's continuing role and of her knowledge, by that date, of Plaintiff's written objections and reports of May 19 and May 22, 2025. Plaintiff does not allege what Eriks intended by these instructions.

102. Plaintiff's written reports to Eriks. Plaintiff alleges that she told Eriks in writing on May 12, 2025 that the assailant in the May 11, 2025 assault was no longer at Prairie View but that his friends remained and "pose a threat of retaliation," and asked that D.B. be transferred if not released; on May 19, 2025 that staff had not reported the May 18 assault to police, had not allowed D.B. to call 911 and had threatened punishment; and on May 22, 2025 that staff were threatening D.B. with punishment for calling 911 and, that evening, that staff were manipulating him to limit contact with her. Eriks replied "Received and reviewed" to Plaintiff's May 20 email on May 21, 2025 and to her evening May 22 email on May 23, 2025. Plaintiff has found no DCS record of a step taken in response other than the May 23 documentation instructions (¶ 101). Plaintiff does not allege that Eriks directed, or knew in advance of, any assault or threat. These

facts concern what Eriks was told; any claim for harm to D.B. belongs to him, and Plaintiff does not assert it.

103. On May 19, 2025 the Plymouth Police Department opened report PPD2505136 (reported at 1:59 p.m.) after Plaintiff called to report the May 18 assault on D.B. The officer's narrative records Plaintiff's statement that D.B. "was told that he would get in trouble for calling emergency services"; that Prairie View's Tonice Fenton said she planned to report the battery on May 19 but had not yet done so; that two juvenile residents struck D.B., one of whom admitted it; and that D.B. said that "at first, he told staff he didn't want to report the battery." The report records an assault by other residents. Plaintiff pleads it as the record of what she reported and of what Prairie View staff told police, not as evidence that any defendant caused the assault.

**J. Plaintiff's injuries**

104. From October 2024 until the Indiana CHINS case was closed on June 12, 2025, Plaintiff was separated from her son, denied a say in where he would live, and left unable to protect him. She suffered serious emotional distress.

105. Plaintiff was branded in DCS's records as a perpetrator of child neglect, became subject to the statutory consequences described in ¶¶ 66-67, and suffered damage to her reputation and standing as her son's mother.

106. In April and May 2025, as Plaintiff alleges in ¶¶ 90-93 and 100, her telephone calls with her son were interrupted, monitored and limited, and she suffered emotional distress from the loss of uninterrupted time with him.

107. Plaintiff's losses from the matters alleged in Counts I, II, III and IV continued at least until the Indiana CHINS case was closed on June 12, 2025, and some losses are ongoing. Her claim in Count V is limited as stated in ¶ 148.

## V. CLAIMS FOR RELIEF

Each count incorporates only the paragraphs it cites.

**COUNT I. Fourteenth Amendment, procedural due process: the November 2024 neglect finding (against DeFord and Stotts)**

108. Plaintiff incorporates ¶¶ 15-67, 105 and 107.

109. Plaintiff has a liberty interest in her reputation and in her status as a parent. DCS substantiated neglect against her and branded her a perpetrator, and the finding carried legal consequences under Indiana law (¶¶ 66-67). On its face, Indiana Code § 31-34-4-2 bars DCS from placing a child in a home where a person with a substantiated report resides, absent an exception the statute allows the court or DCS to apply after considering specified factors. On information and belief, as alleged in ¶ 66, DCS also entered the finding in the Child Protection Index. By statute, that entry makes the finding available to law enforcement agencies, to persons and agencies entitled to receive reports under Indiana Code chapter 31-33-18, to DCS licensing staff, and to juvenile courts and parties in certain placement cases requiring a criminal history check (§ 31-33-26-16), and it is distinct from the § 31-34-4-2 placement bar described above, which is triggered by a substantiated report itself, not by Index entry (¶ 67). Plaintiff alleges these concrete statutory consequences of Index entry; whether they are sufficient to constitute a change in her legal status for purposes of the liberty interest asserted here is a question of law for the Court, distinct from the separate and unresolved factual question whether any particular placement decision, employment check, or other third-party consequence has in fact followed from that entry. Plaintiff does not allege on present information that DCS applied the § 31-34-4-2 bar in a particular placement decision; she alleges that the finding altered her legal status as a parent.

110. DeFord was the assessing case manager and, on information and belief, completed the Form 311. Stotts approved it (¶¶ 61-62). The Form 311 is a DCS administrative record. It is not an order of any court.

111. Before making the finding DCS gave Plaintiff no hearing and no opportunity to present information (¶ 64). Its own record shows no date, address or method for the Notice of Availability it says it mailed (¶ 54). Plaintiff did not receive it (¶ 55). She therefore had no notice of the finding or of any right to seek review of it, and did not first see the finding's text until she received the PDR in February 2025 (¶ 65).

112. DeFord and Stotts did not take into account the evidence in their possession that tended to show that the neglect they substantiated did not occur: DeFord's own log that the father held legal custody and that Plaintiff did not, and Plaintiff's written statement that she would "love nothing more than to have [D.B.] in my custody" and why she could not safely care for him alone (¶¶ 29, 38, 57). They excused the father's identical conduct as compliance with a court order but did not consider that fact for Plaintiff (¶¶ 51, 58).

113. DCS's later position that Plaintiff was legally unable to take placement (¶ 60) cannot be reconciled with substantiating neglect against her for not taking D.B. while treating the father's refusal as compliance with a court order (¶¶ 51, 58).

114. DeFord knew of the omitted facts when the 311 was completed. Stotts approved a document that on its face treated the two parents inconsistently (¶ 61). Each acted knowingly or with reckless disregard of Plaintiff's rights.

115. Plaintiff was injured and seeks compensatory, nominal and punitive damages.

**COUNT II. Fourteenth Amendment, familial association: the placement search (against DeFord and Holland)**

116. Plaintiff incorporates ¶¶ 15-73, 104 and 107.

117. Plaintiff is D.B.'s mother and her parental rights have never been terminated. The Fourteenth Amendment protects a parent's interest in the care, custody and companionship of her child. Plaintiff's interest was limited by the 2013 custody order, which gave D.B.'s father custody, but it was not extinguished by it.

118. After October 25, 2024 DCS exercised its own authority over where D.B. would live. This count does not challenge any statement DCS made to the court or any ruling of the court, and it does not seek to enforce any Indiana statute. Indiana law is pleaded only to show what DCS itself recognized as its duty: Ind. Code § 31-34-4-2(a) directs DCS to consider a suitable, willing relative before any other out-of-home placement.

119. From October 23, 2024 through December 2024, DCS decided where D.B. would live: first the Clark County Youth Shelter, then a prospective foster placement (¶ 69), and then, on December 11, a search of relatives that asked only the custodial father. In that search Holland's only recorded effort to reach Plaintiff was one telephone call that morning, which went unanswered; the entry records no email, text, second call, or question to Plaintiff about whether she wanted D.B. placed with her. No Defendant evaluated Plaintiff's home. An unanswered call is not an inquiry (¶¶ 68-71).

120. DeFord's contemporaneous log of her October 23 call does not record that she asked Plaintiff whether she would take D.B., or that Plaintiff refused (¶¶ 30-31). DeFord nonetheless recorded, and Stotts approved, in the Form 311 and at the November 14, 2024 meeting, that no willing caregiver had been identified (¶ 63), and Holland worked from that record (¶¶ 69, 72). The records presently available to Plaintiff establish Stotts's approval of the Form 311 assessment but do not establish her personal participation in the December 2024 placement search described in this Count. Plaintiff therefore brings this Count against DeFord

and Holland. Plaintiff does not know what Defendants relied on beyond these entries, and alleges on information and belief, based on them, that Defendants treated Plaintiff as unavailable without asking her.

121. Excluding a parent who retains her parental rights from any inquiry about placement of her child, on the basis of a record DCS had itself created without asking her, substantially burdened her relationship with her son. Defendants had no sufficient justification and acted knowingly or with reckless disregard of her rights.

122. Plaintiff was injured and seeks compensatory, nominal and punitive damages.

**COUNT III. Fourteenth Amendment, procedural due process: notice of the October 25, 2024 hearing (against DeFord)**

123. Plaintiff incorporates ¶¶ 15-49, 104 and 107.

124. Plaintiff had a liberty interest in her relationship with her son and in being heard on where and with whom he would be placed. Due process required notice reasonably calculated, under all the circumstances, to inform her of the hearing and to give her a real opportunity to take part.

125. This count does not challenge any ruling of the court, any testimony, or any statement DeFord made in court, and it does not claim that Plaintiff lacked knowledge that a hearing would be held. It challenges DeFord's own pre-hearing conduct as the DCS case manager who controlled communication with Plaintiff.

126. DeFord was the assessment case manager and the DCS employee who communicated with Plaintiff about the hearing before it was held. She told Plaintiff of it less than twenty-two hours beforehand, by text, and on the morning of the hearing sent the Zoom information at 8:56 a.m., four minutes before it began (¶¶ 33, 43). No summons or copy of the Verified Petition was served on Plaintiff before the hearing, and she had received no written

notice of her rights (¶¶ 45, 49). DCS's own filing records that its request to authorize detention, with the Preliminary Inquiry attached, was filed at 8:19 a.m. on October 25, 2024, for a hearing calendared for 9:00 a.m. that same day, and that its certificate of service states the filing was served on Plaintiff by mail to her Tennessee address on the date of filing; no summons to Plaintiff issued until November 1, 2024. That filing and its certificate of service are the DCS attorney's acts, not DeFord's (¶ 127), and are pleaded only to show that Plaintiff's only practical notice of the October 25 hearing was DeFord's own pre-hearing communication described above.

127. Plaintiff does not allege that DeFord was responsible for serving process; the records available to her show that DCS's attorney designated the manner of service (¶ 49). She alleges that DeFord chose the means and timing of the only notice Plaintiff received, knew Plaintiff could not join by video, and was the person through whom that information would reach DCS's attorney and the Court (¶¶ 34-36). Under Rule 8(d)(2) Plaintiff pleads in the alternative that, if service was DeFord's responsibility, she did not arrange it.

128. DeFord knew, from Plaintiff's 11:21 a.m. text, that Plaintiff did not have enough signal to join a video call and would be moving camp (¶ 34). She replied, "Okay I will let the courts know," but the DCS communication about Plaintiff's absence reflected in the records produced is her email, bearing the subject line "LARF, [D.B.], Daniel, Detention," that says "Mother has reported she is not going to be present" and does not say why (¶ 36). On October 30, 2024 DeFord texted Plaintiff that "[n]othing was stated about your absence, only that you would not be present," and that "I have printed it and provided it for the legal department though so it IS available." Plaintiff does not know whether DCS's attorney received that material before the hearing began. She told Plaintiff that a letter might not be presented (¶ 35).

129. On information and belief, the Court was not given Plaintiff's 12:23 p.m. October 24, 2024 email, or her explanation that she lacked signal, before the hearing. The basis for that belief is that DeFord's October 24 email says only that "Mother has reported she is not going to be present" and gives no reason; that DeFord told Plaintiff on October 30, 2024 that "[n]othing was stated about your absence, only that you would not be present" (¶ 128); and that DCS's contact log records no October 24 communication with Plaintiff (¶ 37).

130. Plaintiff was not served before the October 25, 2024 hearing, as DCS's attorney and the Court acknowledged on April 3, 2025 when discussing that hearing (¶ 45). The Court began the hearing without Plaintiff, noted that it did not see her, and continued the initial hearing as to her (¶ 44).

131. An informal text message less than a day before a hearing, with Zoom information sent minutes before it began, to a parent DeFord knew had said she could not receive a video call, was not notice reasonably calculated to afford Plaintiff a meaningful opportunity to take part, and, on information and belief (¶ 129), the Court was not told why Plaintiff was absent.

132. DeFord acted knowingly or with reckless disregard of Plaintiff's rights.

133. Plaintiff seeks nominal damages and compensatory damages for her emotional distress and for the loss of the opportunity to be heard.

**COUNT IV. Fourteenth Amendment, equal protection (class of one): the November 2024 neglect finding (against DeFord and Stotts)**

134. Plaintiff incorporates ¶¶ 15-21, 50-65, 105 and 107. This count is pleaded in the alternative to Count I.

135. Plaintiff and D.B.'s father were the two parents named in the same assessment. Neither took D.B. back after he was released from detention. The 311's decision table lists both as "Substantiated" for neglect, and its first page states "Conclusion: Substantiated." Its

conclusion statement, however, finds "a lack of a preponderance of evidence" of neglect by the father because his refusal "was due to a legal court order," and finds a preponderance of evidence against Plaintiff (¶¶ 50, 51). Plaintiff does not know what final disposition DCS recorded for the father; the document contradicts itself.

136. Plaintiff had no custody of D.B. and no authority to take him without the father's agreement (¶ 59). The father, by contrast, held full custody, had been charged with assaulting D.B., and was subject to a no-contact order (¶¶ 18, 20, 27). DeFord's own contact log recorded each of these facts (¶¶ 26, 27, 29).

137. The 311's own decision table lists the father as "Substantiated" while its conclusion finds the evidence insufficient as to him (¶ 51). DeFord, on information and belief, completed, and Stotts approved, a document that on its face applies one standard to the mother and another to the father for the same act (¶¶ 58, 61).

138. To the extent DCS recorded a different disposition for the father than for Plaintiff, DeFord and Stotts intentionally treated Plaintiff differently, and there was no rational basis for it: the father, who held full custody, had told DeFord he would rather serve jail time than take D.B. back, while Plaintiff had no custody and gave DeFord an account of her circumstances (¶¶ 56, 29, 38). Plaintiff alleges on information and belief that DCS recorded different dispositions, based on the 311's conclusion statement and the Predispositional Report's repetition of it (¶¶ 51, 65); the 311's decision table says otherwise. Plaintiff pleads in the alternative under Rule 8(d)(2) and will seek the father's recorded disposition in discovery.

139. Plaintiff was injured and seeks compensatory, nominal and punitive damages.

**COUNT V. Fourteenth Amendment, familial association and procedural due process: the May 14, 2025 instruction that D.B.'s telephone calls be supervised (against Eriks)**

140. Plaintiff incorporates ¶¶ 15-21, 81, 82, 89-103, 106 and 107.

141. Plaintiff is D.B.'s mother and her parental rights had not been terminated. Her interest in communicating with her son, who was a minor in DCS's care, was limited by his placement but not extinguished by it.

142. On May 14, 2025 Eriks, a DCS employee, instructed Prairie View's Tonice Fenton that D.B.'s telephone calls "should be supervised at this time," and Fenton said she "understood and would advise staff" (¶ 95). On May 19, 2025 Eriks told Plaintiff in writing, after speaking with Prairie View that morning, that "All calls are supervised" (¶ 100). The ten-minute limits and monitoring Plaintiff describes began about May 8, 2025, before Eriks's instruction, and Plaintiff does not attribute them to Eriks (¶ 92). Plaintiff does not allege that Eriks personally listened to or interrupted any call. She alleges that after May 14 Prairie View staff continued to supervise, interrupt and limit her calls with D.B., including on May 18 and May 22, 2025 (¶¶ 92-93), while Eriks's supervision instruction was in place and Eriks described supervision of all calls as the rule. Plaintiff identifies as likely to have evidentiary support after discovery that Prairie View staff applied Eriks's instruction, and understood it as DCS's direction, in supervising her calls.

143. The instruction cites no court order. The Court had said on April 3, 2025 that it had not restricted contact, and DCS's attorney wrote on April 17, 2025 that DCS had placed no restrictions on D.B.'s ability to communicate with family (¶¶ 81, 82). The entry records no notice to Plaintiff and no opportunity for her to respond.

144. Plaintiff told Eriks in writing on May 19, 2025 that she objected to the restrictions and demanded that they cease (¶ 100), and repeated her objections and reports on May 20 and May 22, 2025 (¶ 102). Eriks replied on May 19 by describing Prairie View's rules, including that all calls were supervised, and on May 21 and 23 with "Received and reviewed." Plaintiff has

found no record that Eriks lifted or changed her instruction, and Eriks continued to direct how Prairie View handled the calls (¶ 101). Eriks's written statements describe Prairie View's policy; none says she approved the policy, and Plaintiff does not allege that she did. Plaintiff alleges that Eriks's own May 14 instruction, her May 19 contact with Prairie View, and her continued silence on supervision after Plaintiff's objections show that she maintained the instruction.

145. Plaintiff acknowledges that the instruction concerned supervision of D.B.'s calls rather than a prohibition on them; that Fenton's report to Eriks was about D.B.'s behavior in the home; that Prairie View had its own call rules (¶¶ 95-96); that the ten-minute limits began before the instruction; that the police report records an assault by other residents and does not implicate any defendant (¶ 103); and that D.B. declined some calls from May 23 to 26 for reasons the records do not state (¶ 98). She alleges that DCS nonetheless imposed supervision of her communications with her son, without a court order, notice or inquiry, and that this substantially burdened her relationship with him.

146. Plaintiff pleads this count in the alternative: if a court order did authorize DCS to supervise D.B.'s calls, Plaintiff challenges only Eriks's independent decision to impose that supervision without notice or inquiry; if none did, the instruction was given without lawful authority. Plaintiff does not allege that Holland or any other DCS employee directed Eriks's instruction.

147. Eriks acted knowingly or with reckless disregard of Plaintiff's rights at least from May 19, 2025, when Plaintiff objected in writing, Eriks confirmed in writing that all calls were supervised, and Eriks did not change her instruction.

148. Plaintiff seeks nominal damages and compensatory and punitive damages against Eriks for the period from May 14 through May 22, 2025. For May 23 through 26, 2025 she seeks

damages to the extent discovery shows that the supervision instruction or Eriks's May 23 directives caused or contributed to D.B.'s refusals (¶ 98). She does not seek damages for the later period in this action, but reserves the right to seek such damages, to the extent not time-barred, in an amended pleading if discovery or subsequent events support them.

## VI. PRAYER FOR RELIEF

Plaintiff asks the Court to:
(a) enter judgment for Plaintiff on each count;

(b) award compensatory damages against each Defendant in an amount to be determined at trial, including for emotional distress and damage to reputation;

(c) award punitive damages against each Defendant on the counts in which Plaintiff alleges knowing or reckless conduct;

(d) award nominal damages on each count on which Plaintiff does not prove actual damages;

(e) award costs and any fees allowed by law;
(f) award pre- and post-judgment interest as allowed by law; and

(g) grant any other relief the Court considers just.

## VII. JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

## VIII. SIGNATURE

Dated: October 23, 2026
Respectfully submitted,
/s/ Amber Renee Vanlangen
Amber Renee Vanlangen, f/k/a Amber Renee Blevins

Plaintiff, pro se
4085 Lylewood Rd.
Woodlawn, TN 37191
931-801-0154
bitterrootsoffaith@gmail.com